UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MYRNA SPANN,                          )
                                      )
        Plaintiff,                    )
                                      )
    vs.                               )          Case No. 4:10CV 719 CAS(LMB)
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
        Defendant.                    )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Myrna Spann for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 21).

## Procedural History

On August 24, 2006, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on March 31, 2006. (Tr. 80-87). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated July 22, 2008. (Tr. 39-45, 14-20). Plaintiff

then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on February 22, 2010. (Tr. 9, 1-4). Thus, the

decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981,

416.1481.

**Evidence Before the ALJ**

**A.      ALJ Hearing**

Plaintiff's administrative hearing was held on June 26, 2008. (Tr. 23). Plaintiff was

present and was represented by counsel. (Id.). Also present was vocational expert Vincent

Stock. (Id.).

The ALJ examined plaintiff, who testified that she was forty-six years of age and

completed thirteen years of school. (Id.). Plaintiff stated that she worked as a cashier at

Schnucks. (Tr. 24). Plaintiff testified that she also worked as a full-time teacher at a Christian

school. (Id.). Plaintiff stated that she worked at this position for two years and that the position

ended in 2002. (Id.).

Plaintiff testified that she last worked as a home-school teacher. (Id.). Plaintiff stated that

she taught children in her home at this position. (Id.). Plaintiff testified that she last worked as a

home-school teacher in 2005. (Tr. 25). Plaintiff stated that she has not worked since 2005. (Id.).

Plaintiff testified that she was hospitalized in July of 2006 due to a sickle cell disease[1]

crisis. (Id.). Plaintiff stated that she was diagnosed with renal failure at that time. (Id.). Plaintiff

---

[1]An autosomal recessive anemia characterized by crescent or sickle-shaped erythrocytes
and accelerated hemolysis. Homozygotes develop "crisis" episodes of severe pain due to
microvascular occlusions, bone infarcts, leg ulcers, and atrophy of the spleen associated with
increased susceptibility to bacterial infections. Occurs most commonly in people of African
descent. Stedman's Medical Dictionary, 80 (28th Ed. 2006).

testified that when she presented to the hospital, she complained of chest pain, low back pain, arm pain, and leg pain. (Tr. 26). Plaintiff stated that she had not been taking folic acid as prescribed at that time. (Id.). Plaintiff testified that this was her last inpatient admission for a sickle cell crisis. (Id.). Plaintiff stated that she underwent cardiac tests at that time, which revealed coronary artery disease.[2] (Id.).

Plaintiff testified that Dr. David Shaw is her general practitioner. (Tr. 27). Plaintiff stated that Dr. Timothy Rearden is her hematologist. (Id.). Plaintiff testified that she sees Dr. Rearden every three months for her sickle cell disease. (Id.). Plaintiff stated that the sickle cell disease causes her to experience pain so severe that she is unable to "do anything." (Id.). Plaintiff further described her pain as "worse than having babies." (Id.). Plaintiff testified that she is unable to walk or drive when she experiences this pain and she takes narcotic pain medication. (Id.).

Plaintiff stated that she saw an Ear, Nose and Throat ("ENT") specialist to have her hearing tested in 2007. (Tr. 28). Plaintiff testified that testing revealed hearing loss. (Id.). Plaintiff stated that she did not remember the name of the ENT doctor. (Id.). Plaintiff testified that the ENT referred her to a neurologist. (Id.). Plaintiff stated that Dr. Richard Logan is her neurologist. (Id.).

Plaintiff testified that she has gallstones and that surgery has been recommended. (Id.). Plaintiff stated that she deferred the surgery so that she could see a gastroenterologist. (Id.). Plaintiff testified that the gastroenterologist recommended that plaintiff undergo an MRI. (Tr.

---

[2]Narrowing of the lumen of one or more of the coronary arteries; can cause congestive heart failure, angina pectoris, or myocardial infarction. Stedman's at 554.

29).  Plaintiff stated that she experiences stomach upset and back pain as a result of delaying the gallstone surgery.  (Id.).

Plaintiff stated that she went on a weekend trip to Louisville, Kentucky the previous month to visit her husband's son.  (Id.).  Plaintiff testified that she had not made any other trips in the twelve months prior to the hearing.  (Id.).

Plaintiff's attorney next examined plaintiff.  (Id.).  Plaintiff's attorney asked plaintiff to describe her pain.[3]  (Id.).

Plaintiff testified that Dr. Rearden saw her when she was hospitalized.  (Tr. 30).  Plaintiff stated that she had been treating with Dr. Rearden for a long time prior to her hospitalization.  (Id.).  Plaintiff testified that she was unable to afford to see Dr. Rearden on a regular basis but now that she has Medicaid benefits, she is able to see him regularly.  (Id.).

Plaintiff stated that the sickle cell disease causes her to feel tired and weak every day.  (Id.).  Plaintiff testified that Dr. Rearden helps her manage her symptoms.  (Tr. 31).  Plaintiff stated that Dr. Rearden prescribes medication, including Vicodin[4] and ibuprofen.  (Id.).  Plaintiff testified that she rests frequently due to the fatigue.  (Id.).

Plaintiff testified that, on a typical morning, she first takes a shower.[5]  (Id.).

Plaintiff testified that she is able to wash dishes, do laundry, fold clothes, make the beds, and cook dinner.  (Tr. 32).  Plaintiff stated that she has three children, who are aged 21, 15, and

---

[3]The transcript of the administrative hearing provided to the court is missing the page (page 8) that includes plaintiff's testimony regarding her pain.

[4]Vicodin is an opioid analgesic indicated for the relief of moderate to moderately severe pain.  See Physician's Desk Reference (PDR), 532 (63rd Ed. 2009).

[5]The transcript of the administrative hearing provided to the court is missing two pages (pages 11 and 13), which include plaintiff's testimony regarding a typical day.

9. (Tr. 32-33). Plaintiff testified that her twenty-one-year-old daughter lives on her own. (Tr. 33). Plaintiff stated that her children help her with household chores. (Id.). Plaintiff testified that her children help her mop the floors and clean the bathroom. (Id.). Plaintiff stated that her husband does not help with chores. (Id.).

Plaintiff testified that she stopped working in 2006. (Tr. 34). Plaintiff stated that she had been working full-time as a home-school teacher at her last position. (Id.). Plaintiff testified that the children's parents picked the children up from her home at 2:30 or 3:00 p.m. (Id.). Plaintiff stated that she has not worked part-time since March 2006. (Id.).

The ALJ then asked vocational expert Vincent Stock to assume a hypothetical claimant with the following limitations: able to lift and carry up to twenty pounds occasionally and ten pounds frequently; able to stand and walk for six hours out of eight; able to sit for six hours; can occasionally climb stairs and ramps; can never climb ropes, ladders, and scaffolds; and must avoid concentrated exposure to extreme cold, hazards of unprotected heights, and vibration. (Tr. 35). Mr. Stock testified that the individual could perform plaintiff's past work as a home school teacher. (Id.). Mr. Stock stated that the individual could perform plaintiff's positions as a kindergarten teacher and cashier as they are performed in the national economy (light), but not as plaintiff performed them (medium). (Id.).

The ALJ next asked Mr. Stock to assume a hypothetical claimant with the same restrictions as the first hypothetical except that the individual can lift ten pounds occasionally, can lift less than ten pounds frequently, can stand and walk for two hours out of eight, and can sit for six hours. (Tr. 36). Mr. Stock testified that the individual could perform plaintiff's past position of home school teacher as she performed it, at the sedentary level. (Id.). Mr. Stock stated that

the individual could perform other sedentary work, such as the position of assembly line fabricator, which is unskilled (2,500 positions locally, 100,000 nationally); and security guard monitor, which is unskilled (5,000 positions locally, 200,000 nationally). (Tr. 36-37).

Plaintiff's attorney then asked Mr. Stock to assume that the ALJ found plaintiff's testimony credible with regard to her need to rest or lie down approximately three hours a day. (Tr. 37). Mr. Stock testified that plaintiff would be unable to sustain employment with this limitation. (Id.).

**B.**    **Relevant Medical Records**

The record reveals that plaintiff presented to David Shaw, M.D. on March 4, 2005, with complaints of hives at night. (Tr. 160). Dr. Shaw prescribed medications. (Id.).

On July 27, 2006, plaintiff called Dr. Shaw with complaints of bilateral leg and arm pain and chest tightness. (Tr. 159). Dr. Shaw instructed plaintiff to visit the emergency room. (Id.).

Plaintiff was admitted at Christian Hospital on July 27, 2006, for sickle cell crisis. (Tr. 492). Plaintiff complained of chest pressure and pain in her low back, arm, and leg. (Id.). Soon after plaintiff's admission, she developed tachycardia[6] with increasing chest pain, shortness of breath, and desaturation. (Id.). Plaintiff was diagnosed with acute chest syndrome[7] and was moved to the intensive care unit. (Id.). An exchange transfusion was performed. (Id.). Plaintiff had a "very

---

[6]Rapid beating of the heart, conventionally applied to rates over 90 beats per minute. Stedman's at 1931.

[7]Lung tissue damage; a common complication of sickle cell disease. See About Sickle Cell Disease-Sickle Cell Disease Association of America, Inc., http://www.sicklecelldisease.org/about_scd (last visited July 20, 2011).

stormy course," with infiltrative lung processes and pleural effusions[8] that required removal. (Id.). She was treated with broad spectrum antibiotics and steroids. (Id.). Plaintiff developed renal insufficiency that improved with IV fluids. (Id.). Plaintiff sustained a non-Q wave myocardial infarction[9] secondary to the stress of her sickle cell crisis. (Id.). Plaintiff's heart failure was treated aggressively with medication. (Id.). Plaintiff underwent endoscopy for swallowing issues. (Id.). Plaintiff "became quite ill during this hospital stay and then made a miraculous recovery toward the end of her hospital course." (Id.). Plaintiff was discharged on August 14, 2006, with the following diagnoses: sickle cell crisis with acute chest syndrome, pleural and pericardial effusions, Non-Q wave myocardial infarction felt secondary to sickle cell stress crisis, and development of anemia status post red blood cell exchange transfusion. (Id.). Timothy P. Rearden, M.D. prescribed eight medications at discharge, including Vicodin. (Id.). Dr. Rearden instructed plaintiff to return to his office in one week for blood counts and evaluation. (Tr. 493).

In a consultation report dated July 27, 2006, Dr. Rearden stated that plaintiff's last admission was in November of 2003 and that she had had minor crises usually associated with menstrual periods. (Tr. 177). Plaintiff indicated that she takes Advil for pain crises at home and occasionally takes one of her sister's narcotics if she has severe pain. (Id.). Plaintiff was not taking prescribed folic acid. (Id.).

Plaintiff presented to Dr. Rearden on August 29, 2006 for a follow-up regarding sickle cell disease after acute chest syndrome. (Tr. 251). Dr. Rearden stated that plaintiff looked "fantastic"

---

[8]Increased fluid in the pleural space; can cause shortness of breath by compression of the lung. Stedman's at 616.

[9]Infarction of a segment of the heart muscle, usually due to occlusion of a coronary artery. Stedman's at 968.

compared to when she left the hospital. (Id.). Plaintiff reported an occasional cough, occasional hives that resolved, and occasional numbness in her fingers and toes possibly related to her medication. (Id.). Dr. Rearden's impression was sickle cell, acute chest syndrome resolved; heart murmur, valvular heart disease, pulmonary hypertension;[10] and depression. (Id.). Dr. Rearden recommended that plaintiff follow-up with the pulmonary service for her pulmonary hypertension. (Id.).

On September 8, 2006, plaintiff saw cardiologist Lalit Chouhan, M.D. (Tr. 250). Plaintiff complained of palpitations, which felt like skipping, since she left the hospital. (Id.). Dr. Chouhan found no evidence of congestive heart failure. (Id.). Dr. Chouhan discontinued plaintiff's diuretic medication, noting that it may aggravate cardiac arrhythmias. (Id.). Dr. Chouhan recommended a 24-hour Holter study[11] and follow-up appointment (Id.). Dr. Chouhan continued plaintiff's Toprol[12] for her hypertension and palpitations. (Id.).

Plaintiff saw M. Jeffrey Barkoviak, M.D. at Pulmonary Consultants on September 8, 2006. (Tr. 343-44). Plaintiff reported a lingering cough since returning from the hospital. (Tr. 343). Dr. Barkoviak's assessment was recent pneumonia, sickle cell, acute chest syndrome, recent MI, cardiomyopathy, and hypertension. (Tr. 344). He ordered spirometry testing and adjusted plaintiff's medications. (Id.).

Plaintiff presented to Lisa Hawley, M.D. at Dr. Shaw's office on September 11, 2006 for a

[10]High blood pressure in the arteries of the lungs. See Stedman's at 928.

[11]A Holter monitor is a technique for long-term, continuous usually ambulatory, recording of electrocardiographic signals of magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice. Stedman's at 1222.

[12]Toprol is indicated for the treatment of hypertension, angina pectoris, and heart failure. See PDR at 668.

complete physical. (Tr. 409-10). Dr. Hawley noted fatigue, mild shortness of breath after pneumonia, hypertension, constipation due to narcotic medication, and recent irregularity in menstrual period. (Tr. 409). Dr. Hawley's assessment was hypertension, sickle cell, GERD,[13] and constipation. (Id.). Dr. Hawley prescribed Toprol and Nexium.[14] (Id.).

Records from Dr. Shaw's office reveal that Drs. Shaw and Hawley managed plaintiff's medications from September 2006 through January 2008. (Tr. 377-98).

Plaintiff saw Dr. Chouhan on September 22, 2006, for evaluation of palpitations. (Tr. 308). Dr. Chouhan noted that plaintiff had a negative cardiac catheterization and a normal echocardiogram, and that plaintiff felt well. (Id.). Dr. Chouhan stated that plaintiff underwent a 24-hour Holter, which was unremarkable. (Id.). Dr. Chouhan noted that, with a negative cardiac work-up, he would see plaintiff as needed. (Id.).

Plaintiff saw Dr. Rearden for a follow-up regarding sickle cell disease on October 31, 2006, at which time Dr. Rearden noted that plaintiff was feeling well. (Tr. 324). Plaintiff complained of sinus drainage and a cough. (Id.). Dr. Rearden prescribed Levaquin[15] and referred plaintiff to a surgeon to evaluate a skin abnormality on the right breast. (Id.).

Plaintiff saw Dr. Barkoviak on November 3, 2006, at which time Dr. Barkoviak noted that plaintiff was overall recovering slowly from acute chest syndrome and that she gets fatigued if she overworks herself. (Tr. 342). Plaintiff complained of dyspnea, cough, chest pain, abdominal pain,

---

[13]Gastroesophageal reflux disease, a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

[14]Nexium is indicated for the treatment of GERD. See PDR at 646.

[15]Levaquin is an antibacterial indicated for the treatment of infections. See PDR at 2416.

and headache. (Id.). Dr. Barkoviak diagnosed plaintiff with recent pneumonia/acute chest syndrome, sickle cell, and history of MI. (Id.). He ordered additional testing. (Id.).

Plaintiff saw Dr. Chouhan on November 10, 2006, with complaints of chest fullness and tiredness. (Tr. 307). Plaintiff's cardiac examination was unremarkable. (Id.). Dr. Chouhan stated that, given the negative cardiac work-up and vagueness of plaintiff's symptoms with atypical features, he was ruling out any cardiac source to her symptoms and directed plaintiff to follow-up with her primary care physician. (Id.).

Plaintiff saw Dr. Hawley on November 13, 2006, with complaints of weakness and numbness in the right leg. (Tr. 407). Plaintiff reported symptoms when sitting. (Id.). Plaintiff also complained of hives off and on for six months. (Id.). Dr. Hawley's assessment was sickle cell and dermatitis. (Tr. 408). Dr. Hawley prescribed medication for dermatitis. (Id.).

Plaintiff saw Dr. Chouhan on December 8, 2006, with complaints of recurrent atypical chest pain. (Tr. 306). Dr. Chouhan noted that a CT scan revealed some abnormalities on the lung situation and possible splenic infarct and that she was following-up with Dr. Barkoviak for that issue. (Id.). Plaintiff's cardiac examination was unremarkable. (Id.). Dr. Chouhan stated that plaintiff's chest pains were non-cardiac. (Id.).

Plaintiff saw Dr. Hawley on December 12, 2006, at which time she reported "quite a bit of stress going on." (Tr. 405). Plaintiff indicated that she was taking her medications as directed and that she experienced indigestion often. (Id.). Dr. Hawley's assessment was GERD and hypertension. (Tr. 406). Dr. Hawley prescribed medication for GERD and continued plaintiff's hypertension medications. (Id.).

Plaintiff saw Dr. Barkoviak on December 15, 2006, with complaints of chest pain and

tightness. (Tr. 341). Plaintiff also complained of dyspnea, cough, headache, and rash. (Id.). Dr. Barkoviak adjusted plaintiff's medications. (Id.).

Plaintiff saw Dr. Rearden on December 28, 2006, at which time she reported that she was feeling well, although she complained of occasional chest pain. (Tr. 359). Dr. Rearden found that plaintiff was stable with regard to sickle cell disease and recommended that plaintiff follow-up in two to three months. (Id.).

Plaintiff saw Dr. Hawley on January 29, 2007, at which time plaintiff indicated that she was doing okay, although her chest was bothering her somewhat. (Tr. 403). Plaintiff reported that the pain was not severe. (Id.).

On April 13, 2007, plaintiff presented to Dr. Barkoviak with complaints of feeling tired and a heavy feeling in her chest. (Tr. 340). Plaintiff also complained of dyspnea, cough, abdominal pain, nausea, weakness, rash and edema. (Id.). Dr. Barkoviak diagnosed plaintiff with asthma and prescribed medication. (Id.).

The record indicates that plaintiff saw Dr. Rearden on June 18, 2007, June 25, 2007, July 26, 2007, October 18, 2007, and January 10, 2008 for follow-up regarding her sickle cell disease. (Tr. 431). On June 18, 2007, Dr. Rearden noted that plaintiff had been having episodic crises that are "minimal" off and on. (Tr. 437). Dr. Rearden noted that plaintiff had problems with some numbness in the right side of her face that included her upper and lower lip, problems with her ears, and chronic neck pain. (Id.). Dr. Rearden found that plaintiff appeared to be stable with regard to sickle cell disease. (Id.). Dr. Rearden noted that plaintiff's minor crises are controlled with Advil/Vicodin. (Id.). He stated that he was not certain what happened on the right side of plaintiff's face, although he noted it was 95 percent resolved. (Id.). Dr. Rearden indicated that plaintiff requested an

evaluation so he would perform an MRI of her brain, ear, and C-spine and would refer her to an ENT. (Id.).

Plaintiff underwent an MRI of the brain on June 20, 2007, which was unremarkable. (Tr. 399).

Plaintiff underwent a cervical MRI on June 27, 2007, which revealed marrow changes likely representing those of anemia; otherwise the study was unremarkable. (Tr. 447).

Plaintiff presented to Dr. Hawley on July 2, 2007 for a follow-up regarding the right-sided facial numbness. (Tr. 401-02). Plaintiff reported that the numbness had completely resolved, although she had occasional ear discomfort. (Tr. 401). Plaintiff also reported feeling a little "cranky" lately, and that she wanted to start exercising regularly. (Id.). Dr. Hawley's assessment was sickle cell and mood swings. (Tr. 402). She recommended relaxation strategies and indicated that plaintiff did not want to use medication at that point. (Id.).

Plaintiff saw Dr. Rearden on July 26, 2007, at which time plaintiff complained of decreased hearing of her right ear. (Tr. 436). Dr. Rearden noted that there was no evidence of crises since her last visit. (Id.). Dr. Rearden stated that plaintiff continues to do well with regard to sickle cell disease. (Id.). He noted that plaintiff was scheduled to see an ENT regarding her hearing deficit, which could be related to a sickling crisis. (Id.).

Plaintiff saw Dr. Barkoviak on October 19, 2007, at which time she complained of chest tightness, dyspnea, cough, chest pain, headache, rash, and edema. (Tr. 435). Dr. Barkoviak adjusted plaintiff's medications. (Id.).

Plaintiff saw Dr. Chouhan on December 7, 2007, at which time plaintiff reported that she was doing generally well with all of her medical issues and that she did not have any cardiac-related

symptoms. (Tr. 371). Plaintiff's cardiac examination was unremarkable. (Id.). Dr. Chouhan indicated that she would see plaintiff as needed. (Id.).

Plaintiff saw Dr. Rearden on January 10, 2008, at which time plaintiff continued to complain of decreased hearing in her right ear and indicated that she had an appointment with an ENT later that month. (Tr. 433). Dr. Rearden stated that plaintiff continued to be stable with regard to sickle cell disease. (Id.).

Plaintiff underwent an abdominal sonogram on January 30, 2008, which revealed gallstones. (Tr. 446).

Plaintiff presented to Hannah Ha, M.D. on February 22, 2008, for a surgical consultation regarding gallstones. (Tr. 454). Plaintiff expressed interest in pursing alternative medicine. (Id.). Dr. Ha recommended that plaintiff proceed with surgery. (Id.). Plaintiff indicated that she wanted more time to think about it. (Id.). Dr. Ha noted that plaintiff would need cardiac clearance prior to surgery. (Id.).

Plaintiff saw cardiologist Harvey Serota, M.D. on February 25, 2008. (Tr. 581-82). Plaintiff complained of chest pain and shortness of breath. (Tr. 581). Dr. Serota's impression was microvascular angina,[16] sleep apnea,[17] sickle cell, and prior congestive heart failure. (Tr. 582). Dr. Serota prescribed Advicor[18] and baby aspirin for plaintiff's angina, ordered additional testing to evaluate her palpitations, and ordered a sleep study to evaluate plaintiff's sleep apnea. (Id.). Dr. Serota indicated that plaintiff was clear for gallstone surgery. (Id.).

---

[16]A severe, often constricting pain or sensation of pressure. Stedman's at 85.

[17]Central and/or peripheral apnea during sleep, associated with frequent awakening and often with daytime sleepiness. Stedman's at 119.

[18]Advicor is indicated for the treatment of high cholesterol. See PDR at 403.

Plaintiff presented to Dr. Richard Logan at Division of Neurology on March 3, 2008, with complaints of episodic numbness. (Tr. 460). Plaintiff described recurrent attacks of sickle crisis since she was young. (Id.). Dr. Logan recommended additional testing including an MRI. (Id.).

Plaintiff underwent an MRI of the brain on March 24, 2008, which was normal. (Tr. 461).

Plaintiff presented to the Sleep Disorder Center for a sleep study on March 9, 2008. (Tr. 590-91). Mark S. Wald, M.D. found no evidence of obstructive sleep apnea, reduced sleep efficiency, possible overall sleep deprivation, early REM onset, and some historical features possibly consistent with narcolepsy. (Tr. 590). He recommended additional testing and a urine screen for drugs. (Id.).

Plaintiff saw Dr. Rearden on April 10, 2008, for a follow-up regarding her sickle cell disease. (Tr. 465). Plaintiff reported that she was feeling quite well, although she continued to experience decreased hearing in her right ear. (Id.). Dr. Rearden found that plaintiff's sickle cell disease was stable. (Id.). Dr. Rearden stated that plaintiff has had "minimal to nonexistent" crisis since her last visit. (Id.). Dr. Rearden noted that plaintiff had detectable gallstones with right upper quadrant discomfort for which surgery was recommended, but she was getting a second opinion from a GI specialist. (Id.). Dr. Rearden recommended that plaintiff have the gallstones removed before she develops a crisis. (Id.).

Plaintiff saw Dr. Barkoviak on April 11, 2008, at which time she reported that her sickle cell disease was doing okay. (Tr. 471). Plaintiff complained of dyspnea, cough, chest pain, abdominal pain, headache, rash, and edema. (Id.). Dr. Barkoviak continued plaintiff's medications. (Id.).

In a letter to Dr. Rearden dated April 16, 2008, Eldad Bialecki, M.D. stated that plaintiff had been seen for right upper quadrant pain with associated nausea in January 2008, which had since resolved after instituting a diet and weight loss regimen. (Tr. 482). Dr. Bialecki recommended

holding off on any further testing or surgery for gallstones. (Id.). Dr. Bialecki indicated that plaintiff's main symptoms relate to daytime and nighttime reflux, for which Dr. Bialecki prescribed Nexium. (Id.). Dr. Bialecki stated that, if plaintiff's reflux is not controlled, further work-up would be necessary. (Id.).

Plaintiff saw Dr. Serota on May 9, 2008. (Tr. 579). Dr. Serota noted that plaintiff had undergone cardiac catheterization, which revealed coronary plaquing. (Id.). Dr. Serota stated that plaintiff complained of chest pain and shortness of breath, but was feeling better. (Id.). Dr. Serota's impression was palpitations with benign Holter monitor, benign echo, and mild coronary artery plaquing; elevated cholesterol; gallstones; and sleep apnea. (Tr. 580). Dr. Serota changed plaintiff's cholesterol medication. (Id.).

Plaintiff saw Dr. Hawley on May 27, 2008, at which time plaintiff complained of feelings of anxiety, stomach pain, faintness, and menstrual irregularities. (Tr. 477). Plaintiff reported that she was fatigued from returning from a weekend driving trip to Louisville, Kentucky. (Id.). Dr. Hawley's assessment was fatigue, sickle cell anemia, menorrhagia,[19] poison ivy or other dermatitis, and hyperlipidemia.[20] (Tr. 478). Dr. Hawley prescribed medication for plaintiff's hyperlipidemia and dermatitis. (Id.).

In a letter dated June 23, 2008, Dr. Shaw stated that plaintiff had a diagnosis of sickle cell.

---

[19]Excessively prolonged or profuse menses. Stedman's at 923.

[20]Elevated levels of lipids in the blood plasma. Stedman's at 922.

(Tr. 594). He listed plaintiff's medications as Lipitor,[21] Loratadine,[22] Advair,[23] Xopenex HEA inhaler,[24] ibuprofen, ranitidine,[25] and hydrocodone.[26] (Id.). Dr. Shaw stated that plaintiff is "often hospitalized to maintain her health due to complications from sickle cell." (Id.). He stated that plaintiff is unable to hold a position of employment due to the extensive medications and absences due to complications of this disease. (Id.). Dr. Shaw stated that plaintiff "finds it difficult to function because of the debilitating effects, pain and the effect of the medications that she takes." (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has not engaged in substantial gainful activity since March 31, 2006, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairment: sickle cell disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),

---

[21]Lipitor is indicated for the treatment of coronary heart disease. See PDR at 2503.

[22]Loratadine is an over-the-counter antihistamine indicated for the treatment of allergies. See WebMD, http://www.webmd.com/drugs (last visited July 20, 2011).

[23]Advair is indicated for the long-term maintenance treatment of asthma. See PDR at 1277.

[24]Xopenex inhaler is indicated for the treatment or prevention of bronchospasm in adults with reversible obstructive airway disease. See PDR at 3002.

[25]Ranitidine is indicated for the treatment of GERD. See PDR at 1672.

[26]Vicodin. See PDR at 530.

416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she cannot ever climb ladders, ropes or scaffolds and can only occasionally climb stairs and ramps. She must avoid concentrated exposure to extremely cold temperatures and vibrations of the body. She must avoid concentrated exposure to the hazards of working at heights.

6.     The claimant is capable of performing past relevant work as a home schooling teacher, kindergarten teacher in a private school, and/or cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 16-19).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on August 16, 2006, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on August 16, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

## Discussion

**A.     Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically

severe impairment or combination of impairments.  <u>See</u> 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).

To qualify as severe, the impairment must significantly limit the claimant's mental or physical

ability to do "basic work activities."  <u>Id.</u>  Age, education and work experience of a claimant are

not considered in making the "severity" determination.  <u>See</u> <u>id.</u>

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u>

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  <u>See</u> <u>id.</u>  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

<u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  <u>See</u> <u>id.</u>  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erred in rejecting the opinion of plaintiff's treating physician, Dr. Shaw.  Plaintiff also contends that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitations.  The undersigned will discuss plaintiff's complaints in turn, beginning with the ALJ's credibility analysis.

## 1.    Credibility Analysis

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Defendant argues that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski, 739 F.2d at 1322 (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.

Polaski, 739 F.2d at 1322.  See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work."  Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain.  The ALJ found that plaintiff's subjective complaints were inconsistent with the medical record.  (Tr. 18).  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ stated that "most significant" on the issue of credibility is the inconsistency between plaintiff's complaints of pain at the hearing and the recent report of Dr. Rearden dated April 10, 2008.  (Tr. 18).  The ALJ noted that despite plaintiff's complaints at the hearing of severe pain that limits her ability to "do anything," plaintiff did not make such complaints to Dr. Rearden.  (Id.).  Plaintiff reported to Dr. Rearden that she was feeling quite well.  (Tr. 465).  Dr. Rearden found that plaintiff's sickle cell disease was stable and noted that plaintiff had "minimal to nonexistent" crisis since her last visit.  (Id.).  The ALJ properly found that Dr. Rearden's report

was inconsistent with plaintiff's subjective complaints of disabling pain.

The ALJ also found that the remainder of the medical record was inconsistent with plaintiff's subjective allegations of pain and limitations. (Tr. 18-19). The ALJ noted that plaintiff has only been hospitalized on one occasion and that she recovered completely from such hospitalization. (Tr. 19). He pointed out that plaintiff's treating physician, Dr. Rearden, stated on multiple occasions that plaintiff's sickle cell disease has been stable since her hospitalization and that plaintiff had no further crises or complications other than minor crises that she tolerates well as an outpatient. (Id.).

The ALJ next discussed plaintiff's daily activities. The ALJ stated that plaintiff testified that she experiences pain so severe that she is unable to "do anything," yet she also testified that she engages in many daily activities. (Tr. 18). The ALJ noted that plaintiff testified that she is able to shower and dress, helps her nine-year old prepare breakfast, takes her child to school performs many household chores, and prepares dinner. (Id.). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with her testimony that she experienced pain so severe that she was unable to "do anything." (Tr. 27).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's

complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**2.      Opinion of Treating Physician**

Plaintiff next argues that the ALJ erred in rejecting the opinion of plaintiff's treating physician Dr. Shaw.

In a letter dated June 23, 2008, Dr. Shaw stated that plaintiff is "often hospitalized to maintain her health due to complications from sickle cell." (Id.). He expressed the opinion that plaintiff is unable to hold a position of employment due to the extensive medications and absences due to complications of this disease. (Id.). Dr. Shaw stated that plaintiff "finds it difficult to function because of the debilitating effects, pain and the effect of the medications that she takes." (Id.). He listed plaintiff's medications as Lipitor, Loratadine, Advair, Xopenex HEA inhaler, ibuprofen, ranitidine, and hydrocodone. (Id.).

The ALJ determined that Dr. Shaw's opinion was not credible and gave no weight to the opinion. (Tr. 18). The ALJ found that Dr. Shaw's statements were not credible because they are at odds with the evidence in the record. (Tr. 19). Specifically, the ALJ noted that plaintiff has been hospitalized only once since her alleged onset date and that she recovered completely from this hospitalization. (Id.). The ALJ also pointed on that plaintiff's treating physician Dr. Rearden stated on multiple occasions that plaintiff's sickle cell disease had been stable since her hospitalization and that she had no further crises or complications except for minor crises that she tolerates well as an outpatient. (Id.). The ALJ stated that there is no evidence that plaintiff continues to have serious complications from her sickle cell disease. (Id.).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

In this case, the ALJ provided sufficient reasons for affording no weight to the opinion of Dr. Shaw. The ALJ first noted that Dr. Shaw's statement was contradicted by the record. Although Dr. Shaw stated that plaintiff had been hospitalized often due to complications from sickle cell disease, the record reveals that plaintiff was only hospitalized on one occasion-in July 2006-for sickle cell complications. The ALJ was entitled to discredit Dr. Shaw's opinion when it included statements that were factually inaccurate.

The ALJ next pointed out that Dr. Shaw's statement that plaintiff is unable to maintain employment due to complications from sickle cell disease is inconsistent with the medical evidence in the record. He noted that Dr. Rearden, a treating physician, stated on multiple

occasions that plaintiff's sickle cell disease had been stable since plaintiff's hospitalization. (Tr. 19). When plaintiff presented for a follow-up after her hospitalization on August 29, 2006, Dr. Rearden stated that plaintiff looked "fantastic." (Tr. 251). Plaintiff's cardiac work-up was negative in September 2006. (Tr. 308). On October 31, 2006, Dr. Rearden noted that plaintiff was feeling well and plaintiff complained of only sinus drainage and a cough. (Tr. 324). On December 28, 2006, plaintiff reported that she was feeling well, although she complained of occasional chest pain. (Tr. 359). Dr. Rearden found that plaintiff was stable with regard to sickle cell disease. (Id.). On June 18, 2007, Dr. Rearden stated that plaintiff had been having episodic crises that were "minimal" off and on. (Tr 437). Dr. Rearden found that plaintiff's sickle cell disease was stable and that her minor crises were controlled with medication. (Id.). An MRI examination of plaintiff's brain was normal. (Tr. 399). On July 26, 2007, Dr. Rearden noted that there was no evidence of crises since plaintiff's last visit and that plaintiff continued to do well with regard to sickle cell disease. (Tr. 436). Dr. Rearden stated that plaintiff continued to be stable with regard to her sickle cell disease in January 2008. (Tr. 433). On April 10, 2008, Dr. Rearden again found that plaintiff's sickle cell disease was stable and noted that plaintiff had experienced "minimal to nonexistent" crisis since her last visit. (Tr. 465). The ALJ's finding that plaintiff did not suffer serious complications from sickle cell disease is supported by the medical evidence.

Dr. Shaw's own treatment notes also do not indicate that plaintiff suffered disabling symptoms from sickle cell disease. In September 2006, shortly after plaintiff's hospitalization, Dr. Shaw indicated that plaintiff complained of only "mild" shortness of breath. (Tr. 409). On November 13, 2006, plaintiff complained of weakness and numbness in the right leg, and hives,

but plaintiff's physical examination was normal. (Tr. 407-08). On December 12, 2006, plaintiff complained only of GERD symptoms and her physical examination was normal. (Tr. 406). In January 2007, plaintiff reported that she was doing okay although her chest was bothering her somewhat. (Tr. 403). On July 2, 2007, plaintiff reported that her facial numbness had completely resolved. (Tr. 401-02). On May 27, 2008, plaintiff reported feelings of anxiety and some complaints regarding her menstrual cycle. (Tr. 477). Plaintiff also indicated that she was fatigued after returning from a weekend driving trip to Louisville, Kentucky. (Id.). Dr. Shaw noted no physical findings other than dermatitis. (Tr. 478). Dr. Shaw's own records are not supportive of the presence of disabling symptoms.

The undersigned finds that the ALJ properly considered the record as a whole and articulated good reasons for not giving controlling weight to Dr. Shaw's opinion. Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

3.      **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ erred in characterizing plaintiff's residual functional capacity as "light" work and in failing to make specific findings regarding plaintiff's ability to lift, carry, push, pull, sit, stand, and walk. Plaintiff also argues that the ALJ failed to cite medical evidence in support of his determination.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel,

245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence.  See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she cannot ever climb ladders, ropes or scaffolds and can only occasionally climb stairs and ramps.  She must avoid concentrated exposure to extremely cold temperatures and vibrations of the body.  She must avoid concentrated exposure to the hazards of working at heights.

(Tr. 17).

In support of his residual functional capacity determination, the ALJ discussed plaintiff's credibility and found that plaintiff's subjective complaints were not credible, as previously related. (Tr. 18).  With respect to the medical opinion evidence, the ALJ indicated that he was according no weight to Dr. Shaw's opinion.  (Id.).  The ALJ also noted that Dr. Rearden has stated on multiple occasions that plaintiff's sickle cell disease had been stable since her hospitalization and that she experiences only minor crises that she tolerates well as an outpatient.  (Tr. 19).

The undersigned finds that the ALJ's residual functional capacity determination is not supported by substantial evidence.  The ALJ did not provide a rationale for his residual functional capacity nor did he cite any medical opinions supporting his determination.  The ALJ rejected the

opinion of treating physician Dr. Shaw because it conflicted with the evidence of record. The ALJ indicated that Dr. Rearden has found on many occasions that plaintiff's sickle cell disease was stable and that she experienced only minor crises that did not require hospitalization. Dr. Rearden, however, has never expressed an opinion on plaintiff's ability to function in the workplace. The fact that plaintiff's sickle cell disease is stable and does not require hospitalization does not support the ALJ's determination that plaintiff is capable of performing a range of light work. Although the ALJ suggests that the medical evidence of plaintiff's impairments was minimal, plaintiff suffers from sickle cell disease and has consistently complained of symptoms associated with this disease, including shortness of breath, pain, and fatigue. There is simply no medical evidence supporting the ALJ's finding that plaintiff is capable of performing a limited range of light work.

Further, as plaintiff points out, the ALJ failed to make a finding regarding plaintiff's ability to lift, carry, push, pull, sit, stand, and walk. Upon making a RFC assessment, an ALJ must assess a claimant's work-related abilities on a function-by-function basis. See Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004); S.S.R. 96-8p.

As stated above, after rejecting the opinion of Dr. Shaw, there is no opinion from any physician, treating or consulting, regarding plaintiff's ability to function in the workplace with her impairments. As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform a limited range of light work. The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace.  See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Here, the ALJ's physical residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence.  See Lauer, 245 F.3d at 703.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this 19th  day of August, 2011.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE